UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EDWARD FLORENCE,

        Plaintiff,

    v.

NANCY A. BERRYHILL,

        Defendant.

Case No.17-cv-01115-EDL

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 15, 16

On March 3, 2017, Plaintiff Edward Florence filed this lawsuit pursuant to 42 U.S.C. Section 405(g), seeking judicial review of the Commissioner of Social Security's decision to deny his application for Disability Insurance Benefits under Title II of the Social Security Act. Defendant Nancy A. Berryhill filed a cross motion for summary judgment on October 6, 2017. For the following reasons, the Court DENIES Plaintiff's motion for summary judgment and GRANTS Defendant's cross motion for summary judgment.

## I.    BACKGROUND

Plaintiff was fifty three years old at the time of his alleged disability onset. AR 233. He completed high school and has a college degree in liberal studies. AR 67-68. At the time of his application for disability benefits, Plaintiff claimed a disability based on neurological problems and arthritis. AR 143. Plaintiff has worked in a variety of settings and his most recent job was in customer relations in a wine brokerage. AR 68.

### A.    Procedural History

On February 12, 2013, Plaintiff applied for disability benefits, alleging a disability onset date of September 15, 2012. AR 233-39. His application was initially denied on May 21, 2013, and upon reconsideration on September 25, 2013. AR 143-45, 151-56. Plaintiff requested a

hearing on October 10, 2013. AR 157-58. Administrative law judge ("ALJ") Judson Scott held hearings on September 4, 2014 and July 8, 2015, and rendered an unfavorable decision on September 24, 2015. AR 9-23. On January 30, 2017, the Appeals Council denied Plaintiff's request for review of the ALJ's decision. AR 1-3. On that date, the ALJ's decision became final. Plaintiff then filed this lawsuit on March 3, 2017.

On September 10, 2017, Plaintiff moved for summary judgment, asking the Court to reverse the final decision of the Commissioner and order the payment of benefits, or alternatively to remand for a new hearing before an ALJ. Dkt. No. 15. On October 6, 2017, the Commissioner filed a combined opposition and cross motion for summary judgment, asking the Court to affirm the Commissioner's decision. Dkt. No. 16. Plaintiff did not file a reply brief.

### B. Plaintiff's Medical History

#### 1. Cosette Jeanine Taillac-Vendo, L.C.S.W. (examining social worker)

On October 29, 2012, Plaintiff met with Cosette Jeanine Taillac-Vendo, L.C.S.W., for a cognitive assessment. AR 679-84. According to her notes from the visit, Plaintiff was seeking services to address adjustment problems he was experiencing, especially in his work environment. AR 680. She stated that his symptoms were problems with his performance and personal interactions at work, as well as difficulty staying asleep. AR 680. Plaintiff said that he has a history of problems maintaining employment because of his learning disabilities, and he brought in copies of his testing results from 1970 from a child neurologist and testing from 1989 from the Department of Rehabilitation. AR 680. Because of his concerns about his ability to keep a job, Plaintiff specifically asked Taillac-Vendo if he qualified for disability. AR 680.

Taillac-Vendo performed a mental status examination and reported that he appeared well-groomed and appropriately dressed. AR 681. His behavior was normal and his demeanor was pleasant and cooperative. AR 681. His thought content was normal, although his thought process was disorganized. AR 681. His attention and concentration were within normal limits and his recent and remote memory was intact. AR 681. His speech was normal, mood was euthymic and congruent. AR 681. His fund of knowledge was normal. AR 681. His impulse control was fair, and Taillac-Vendo noted that he recently quit his job impulsively. AR 681. His insight and

judgment were good.  AR 682.

His diagnosis was hearing loss, occupational problems, and GAF of 41-50 indicating serious symptoms, unable to keep a job.  AR 682.  Plaintiff was referred for neuropsychological testing.  AR 682.

### 2.    Alice L. Yee-Jeong, L.C.S.W. (treating therapist)

On July 26, 2013, Plaintiff saw Alice L. Yee-Jeong, L.C.S.W., for psychiatric outpatient triage screening.  AR 685-92.  She performed a mental status examination.  AR 689.  Plaintiff was dressed casually and his demeanor was pleasant and cooperative.  AR 689.  His behavior, speech, and language were normal.  AR 689.  He reported being tired due to waking early that morning, and he was fully oriented and his attention was normal.  AR 689.  His affect was appropriate and full range.  AR 689.  His thought processes were logical and his content was normal and goal directed.  AR 689.  Yee-Jeong's impression was that he was isolated and felt unsupported by his family while he was caring for mother who had Alzheimer's.  AR 689.  She assigned him a GAF of 61-70 indicating mild symptoms, and diagnosed him with cognitive disorder.  AR 690.  AR 689.  She referred him to two different doctors and for a return visit with her.  AR 690.

After his initial visit, Plaintiff continued to see Yee-Jeong several more times through 2013 and into 2014.  AR 692-719.  Throughout this time, Yee-Jeong generally noted her impression that Plaintiff's condition improved or was stable.  AR 692-93, 697, 700, 704, 713.  His mental status examinations yielded normal results, according to Yee-Jeong's notes.  AR 693, 698, 701, 705, 713.  She maintained her diagnosis that Plaintiff had cognitive disorder with a GAF of 61-70, although she changed the GAF to 81-90 indicating minimal symptoms in May 2014.  AR 693, 698, 701-02, 705-06, 709-10.

In February 2014, Yee-Jeong noted for the first time that Plaintiff reported difficulties with memory and accessing his fund of knowledge on the mental status examination.  AR 709.  At that time she described Plaintiff as having "mild cognitive deficiencies and needing some support."  AR 709.  In May 2014, she noted that he continued to have memory problems that interfered with his work, but also noted that his recent and remote memory were intact during the mental status examination.  AR 713.  She also noted that his depression and anxiety had improved, although he

1    continued to experience some irritability.  AR 713.  In July 2014, Yee-Jeong updated the

2    diagnosis to include adjustment disorder with mixed anxiety and depressed mood.  AR 716.

3            Yee-Jeong completed a Mental Disorder Assessment on November 12, 2013, after seeing

4    Plaintiff on three different visits.  AR 515-17.  She noted that Plaintiff reported to her that he has

5    cognitive disorder, but that she has not seen the cognitive neuropsychological testing.  AR 515.

6    She stated that she is seeing Plaintiff to treat his stress.  AR 515.  As to the functional assessment,

7    she noted that she could not address most of the issues, but opined that Plaintiff was markedly

8    limited as to his ability to get along with co-workers and his ability to tolerate usual stresses

9    encountered in a competitive workplace.  AR 516.  Her Mental Disorder Assessment was not

10   countersigned by a doctor.  AR 517.

11           Yee-Jeong completed a second Mental Disorder Assessment of Plaintiff on July 31, 2014.

12   AR 653-55.  His diagnoses were cognitive disorder NOS, depressive disorder NOS, and

13   adjustment reaction to diagnosis.  AR 653.  His symptoms included feeling overwhelmed, trouble

14   focusing, and depression.  AR 653.  For the clinical observations that supported the diagnoses, she

15   noted that he was given psychological testing by Dr. Priscilla Marquis that substantiated the

16   cognitive disorder diagnosis.  AR 653.  He was receiving treatment through supportive individual

17   therapy to adjust to his cognitive disorder and attending weekly group therapy.  AR 653.  On his

18   functional assessment, she stated that he was not significantly limited on his ability to perform

19   activities with a schedule, maintain regular attendance, and be punctual within customary

20   tolerances; was moderately limited in his ability to understand and remember very short and

21   simple instructions, the ability to sustain an ordinary routine without special supervision, the

22   ability to make simple work-related decisions, and the ability to get along with co-workers; and he

23   was markedly limited in the ability to carry out very short and simple instructions, ability to

24   perform at a consistent pace without an unreasonable number and length of rest periods, ability to

25   accept instructions and respond appropriately to criticism from supervisors, and the ability to

26   tolerate usual stresses encountered in a competitive workplace.  AR 654.  She noted that Plaintiff

27   had minor neurocognitive disorder with deficits in overall cognitive functioning, verbal abilities,

28   attention, executive functioning, visual spatial skills, motor skills, and memory.  AR 654.  This

4

second Mental Disorder Assessment was countersigned by Dr. Priscilla Marquis.  AR 655.

### 3. Priscilla Marquis, Ph.D. (examining psychologist)

On February 13, 2013, Priscilla Marquis, Ph.D. completed a neuropsychological report about Plaintiff, with assistance from testing technician Rhea Oliveros, B.S.  AR 657-75.  Plaintiff was referred for this testing by Taillac-Vendo.  The report noted that Plaintiff complained of memory problems, eye-hand difficulties, and "figuring out how things fit together."  AR 657.  It also noted his reports of life-long cognitive, visual, and motor difficulties.  AR 658.

Plaintiff was given a mental status examination.  He was cooperative, although showed a somewhat irritable manner at times and a gregarious manner at other times.  AR 662.  His mood was irritable and his affect was flat.  AR 62.  He was oriented as to person, place, date, and time.  AR 662.  He showed no obvious distractibility during the examination.  AR 662.  His fund of knowledge was appropriate for having a college education.  AR 662.  His thought process was linear and there was no evidence of disordered thought.  AR 662.  Some impulsivity was noted, but his judgment was good.  AR 662.  His insight into his level of difficulties was limited.  AR 662.

Based on his WAIS testing, Dr. Marquis concluded that the results suggest a significant decline in cognitive functioning of one standard deviation.  AR 664-65.  She further noted that his cognitive performance is much lower compared to his level of education and previous functioning.  AR 665.  His results for attention and concentration measured mild attentional impairment, which was worse for visual stimuli.  AR 665.  His memory testing showed severe executive functioning difficulties, as well as mildly impaired memory performance.  AR 665-66.  His results indicated an overall impairment in the area of executive functioning.  AR 667.  Although he had severe difficulties with reading comprehension, which would indicate a decline, the results showed that his verbal language skills were a strength for him.  AR 666.  He showed bilateral motor impairment.  AR 666.  He did not have difficulties with his activities of daily living.  AR 667.  He would, however, have difficulty with more complex activities of daily living.  AR 667.

Based on these results, Dr. Marquis opined that Plaintiff demonstrated cognitive functioning in the borderline to average range, indicating a significant decline in cognitive

United States District Court
Northern District of California

functioning for Plaintiff.  AR 667.  She also opined that he has mild depression, which is attributable in part to his concern about his inability to make a living.  AR 668.  She explained that he may appear to be higher functioning than he really is, primarily due to his verbal abilities, but he is actually severely impaired.  AR 668.  Dr. Marquis concluded that he meets the criteria for cognitive disorder NOS and is disabled.  AR 668.

Dr. Marquis also prepared a one-page summary letter, dated September 8, 2014, which was addressed to Plaintiff's attorney.  AR 721.  In this letter, she reiterated the results of her February 2013 neuropsychological report.  AR 721.  After summarizing her earlier report, she again concluded that Plaintiff meets the criteria for cognitive disorder NOS and is disabled.  AR 721.

### 4.  Kenneth Fox, M.D. (examining physician)

On March 1, 2013, Plaintiff saw Kenneth Fox, M.D., for a neurology evaluation.  AR 434-39.  Dr. Fox's notes state that Plaintiff reported a recent decline in his cognitive function, including in his ability to stay on task and focused, particularly when faced with sequential or multi-step tasks.  AR 434.  Plaintiff also reported that he remained independent in all activities of daily living and cared for his mother.  AR 434.  Dr. Fox's mental status examination found that Plaintiff was alert and oriented to person, place, and time.  AR 436.  His affect was normal and his remote, recent, and immediate memory were normal.  AR 436.  His language was fluent with normal repetition, comprehension, and naming, and his fund of knowledge was appropriate.  AR 436.  An MRI of Plaintiff's brain showed mild nonspecific white matter signal changes.  AR 437.

Dr. Fox concluded that Plaintiff had cognitive impairment, as evidenced by Plaintiff's reported symptoms and neuropsychological testing results.  AR 437.  Dr. Fox noted the possibility that his developmental disorder was becoming more pronounced with age, rather than as a result of neurodegenerative disease.  AR 437.  Although Dr. Fox mentioned the availability of medication as cognitive enhancers, Plaintiff declined to take medication.  AR 437.  Dr. Fox recommended that Plaintiff try cognitive rehabilitation exercise programs, such as Luminosity.  AR 437.

### 5.  Randy Kolin, Psy.D. (examining psychologist)

On September 12, 2013, Randy Kolin, Psy.D., performed a consultative mental evaluation

with cognitive testing for the California Department of Social Services. AR 484-92. Dr. Kolin's report noted that Plaintiff complained of a learning disability and an inability to recall. AR 484. Plaintiff also reported a recent cognitive decline, forgetfulness, and poor memory, among other things. AR 484.

On a mental status exam, Dr. Kolin found that Plaintiff's results were normal, except for attention and memory, which were both impaired. AR 486-87. On the WAIS tests, Plaintiff's full scale composite score was 84, which is in the low average range. AR 488.

Dr. Kolin gave a diagnosis of cognitive disorder NOS and learning disorder NOS. AR 490. For the functional assessment, Dr. Kolin opined that Plaintiff is mildly limited as to the ability to accept instructions from supervisors and interact with co-workers and the public and the ability to adequately perform one or two step simple repetitive tasks; he is moderately limited in his ability to adequately perform complex tasks, the ability to maintain regular attendance in the work place, and the ability to complete a normal workday or workweek without interruptions from a psychiatric condition; and he is markedly limited in his ability to handle normal work related stress from a competitive work environment and his ability to perform basic work activities and to be safety conscious on a consistent basis without special or additional instructions. AR 490. He concluded that Plaintiff's overall prognosis is poor, his mental health symptoms may be chronic in nature, and his mental health symptoms are likely to hinder social or occupational functioning. AR 490.

### C.  ALJ Hearings

#### 1.  Plaintiff's Testimony

Plaintiff testified at the September 4, 2014 hearing. He stated that he has a college degree from a four-year institution in liberal studies. AR 67-68. He also has a certificate in computer programming that he received from City College of San Francisco. AR 72-73. He explained that he has worked various jobs over the years, including work in customer relations at a wine brokerage and working for conventions. AR 68. He left his employment with the wine brokerage around September 2012 because he was having trouble concentrating and with his memory and having difficulties seeing his computer screening and dealing with background noises. AR 68, 81.

At one point in his testimony, he described these issues as "sensory overload." AR 80. After he left the wine brokerage, he applied for work with temporary job placement agencies, but he did not receive any work through them. AR 69.

Since his unemployment began in September 2012, Plaintiff received unemployment benefits for a time and he has also been supported financially by his mother. AR 70. In addition, he receives quarterly dividend payments of approximately $200 from stock he owns and he has approximately $200,000 in savings from which he withdraws approximately $500-1,000 per month for living expenses. AR 70-71.

Plaintiff also addressed questions about his health. He said that he has always had learning disabilities and neurological problems since birth because he was born premature. AR 73. He testified that a few years prior to the hearing the strong side of his brain stopped compensating for the weak side of his brain. AR 73-74. He was not aware of any precipitating event that explains his declining mental compensation. AR 75.

The ALJ asked Plaintiff whether he had depression, and Plaintiff responded that he knows he was diagnosed with mild depression, but he was not aware of any details of the diagnosis and he said he is not taking medicine for it but does see a therapist. AR 78. He also attends meetings of a CogSMART group that is focused on helping people with executive management dysfunction. AR 79, 88. As of the hearing, he was not taking any medication for mental or emotional problems. AR 77. During childhood and adolescence, however, he took Ritalin for attention-deficit disorder. AR 77.

He also explained that he has physical limitations, specifically arthritis in both knees, but that has not prevented him from working although he would not be able to do physical labor because of the arthritis. AR 75-76.

Plaintiff also addressed his living arrangements and his routine activities. He lives with his mother and is responsible for some of her caretaking. AR 83-84. He ensures that she takes her medications, eats her meals, and attends her doctors' appointments. AR 84. Plaintiff has his driver's license and drives a car three or four times a week, sometimes more than once on the same day. AR 84. When he drives, he stays within a couple of miles of his home and keeps to

United States District Court
Northern District of California

familiar roads.  AR 85.  He explained that he stays away from roads he does not know because he gets confused and he does not like the stress of driving.  AR 85.  He does, however, take public transportation without any problem, except some difficulty with sensory overload.  AR 87.  He does not cook, although he does shop for groceries, and he does not do the housekeeping.  AR 85-86.  He reported using the computer to visit websites, write emails, and download photographs.  AR 86.  He rarely reads because he has a hard time comprehending written words.  AR 86-87.  While he can read and write emails, he said that is different from reading a book or the newspaper.  AR 87.

### 2. Medical Expert Testimony

#### a. Testimony of Dr. Debolt

William Debolt, M.D., testified during the September 4, 2014 hearing as a medical expert.  Dr. Debolt testified that the medical record did not indicate that Plaintiff had any neurological impairments.  AR 89.  When asked by the ALJ if the record showed any executive management function problems, Dr. Debolt responded that some neurological testing indicated such problems may exist, but that those problems are not indicated in the normal mental status examinations that are also in the record.  AR 89.  With respect to the concentration and sensory overload issues that Plaintiff testified to, Dr. Debolt testified that those issues would not pertain to neurological issues.  AR 90.  Although Plaintiff has alleged neuro-sensory hearing loss, Dr. Debolt testified that Plaintiff denied symptoms of hearing loss to a neurologist and that a psychologist noted that there was no notable hearing impairment for conversation.  AR 90-91.  As to the MRI test results from Dr. Fox's neurological consultation, Dr. Debolt testified that the unidentified bright objects in the scan are related to aging and the frequency of high blood pressure.  AR 91.

Based on his review of the medical record, Dr. Debolt testified that Plaintiff's condition did not meet or equal any listings.  AR 92.  With respect to functional limitations, Dr. Debolt testified that because of his back pain and age, a lifting impairment of up to 50 pounds should be given, with the ability to sit, stand, and walk for six out of eight hours a day.  He testified that Plaintiff should not be subject to any additional manipulative or environmental limitations.  AR 93.

9

Richard W. Cohen, M.D., testified as a psychiatric medical expert at the September 4, 2014 hearing.  AR 96.  Dr. Cohen addressed the diagnosis in the medical record of cognitive disorder, concluding that there were conflicts in the record about this diagnosis.  AR 96.  He noted that the mini mental status exam was normal and that recent memory and remote memory were intact, which would indicate that there is no cognitive disorder.  AR 96.  He also considered whether Plaintiff had an adjustment disorder with mixed emotional features.  AR 97.  Dr. Cohen testified that there was some evidence for this, but that it is not a major psychiatric disorder.  AR 97.

Although he stated that there were conflicts in the record, he thought it was more likely than not that Plaintiff does not have a cognitive disorder and more likely than not that he has an adjustment disorder with mixed emotional features.  AR 100-02.  For the cognitive disorder, he testified that if Plaintiff had the disorder, he did not consider it to be a significant medically determinable impairment.  As to the adjustment disorder, Dr. Cohen testified that the impairment did not meet or equal a listing, and any functional limitations resulting from the condition are mild at most.  AR 98, 100-01.  For example, he noted that Plaintiff independently completes activities of daily living, such as cooking, cleaning, shopping, paying bills, running errands, driving, and taking public transportation.  AR 98.  Moreover, his IQ did not significantly diminish and he still has a low average IQ.  AR 101.  Thus, he testified that Plaintiff is at most mildly impaired.  AR 98.

Following the hearing, the ALJ sent Dr. Cohen interrogatories.  AR 734-42.  In his responses, Dr. Cohen stated that Plaintiff is mildly impaired in activities of daily living, moderately impaired in social functioning, moderately impaired in concentration, persistence, and pace, and showed no episodes of decompensation.  AR 734-42.  Dr. Cohen checked the "moderate" box for limitations for understanding and remembering complex instructions, carrying out complex instructions, and making judgments on complex work-related decisions, but also drew lines connecting those boxes to the "marked" boxes.  AR 740.  He concluded that Plaintiff could do simple repetitive tasks that involved at least one to two steps.  AR 734-42.

### c.     Testimony of Dr. Davis

Preston Davis, Psy.D., testified at the July 8, 2015 supplemental hearing as a clinical psychologist medical expert. AR 31. Dr. Davis testified that Plaintiff had cognitive disorder, which he considered a medically determinable impairment, and that it appeared to be mild. AR 42. He also testified that he had a second medically determinable impairment of mild depressive disorder including features of an adjustment disorder. AR 42-43. He concluded that these two conditions, alone or in combination, do not meet or equal a listing. AR 43.

As for any functional limitations to the type of work that Plaintiff could do, Dr. Davis testified that he is capable of completing complex tasks. AR 44. He also testified that Plaintiff could engage in frequent social interaction with coworkers, supervisors, and the public. AR 45-46. He also testified that Plaintiff could handle ordinary work place stress. AR 47.

Plaintiff's counsel also asked Dr. Davis whether he was completely discounting Dr. Marquis's evaluation that Plaintiff had a cognitive disorder. Dr. Davis explained that he was not discounting it, but that he determined that her evaluation only supported Dr. Cohen's conclusion that Plaintiff's condition did not meet or equal a listing. AR 50-51. He further explained that he considered Plaintiff's functional limitations to be mild. AR 50. To support his conclusion, Dr. Davis pointed to several normal mental status tests. AR 51-52. Dr. Davis said that the fact that there were numerous normal mental status tests over a prolonged period of time was clinically significant evidence that Plaintiff did not have any significant mental disorders. AR 58-59.

### 3.     Vocational Expert Testimony

During the first ALJ hearing on September 4, 2014, Robert Raschke, a vocational expert testified. Mr. Raschke classified Plaintiff's past work into three separate job titles: (1) general office clerk (DOT 219.362-010), SVP 4, light; (2) receptionist (DOT 237.367-038), SVP 4, sedentary; and (3) customer service -- retail, general (DOT 299.367-010), SVP 4, light. AR 106.

The ALJ asked Mr. Raschke to consider a hypothetical individual of the same age, education, and experience as Plaintiff, with the capacity to work at an unrestricted medium exertional capacity. AR 107. This hypothetical individual could lift and carry up to 25 and 50 pounds frequently and occasionally, and sit, stand, and walk for up to six out of eight hours during

a typical work day.  AR 107.  There were no postural, manipulative, hearing, environmental, or mental limitations included.  AR 107.  Mr. Raschke testified that this hypothetical person would be able to perform all three jobs that constituted Plaintiff's past work.  AR 107.  At the ALJ's request, Mr. Raschke also provided two other examples of unskilled jobs that this hypothetical person could do.  AR 107.  They were warehouse worker (DOT 922.687-058**,** SVP 2, medium) and janitor (DOT 381.687-018, SVP 2, medium).

Plaintiff's counsel also asked Mr. Raschke to consider a different hypothetical person.  In her scenario, the hypothetical person has no exertional limitations, but as a result of a cognitive disorder he would miss two or more days of work per month.  AR 109.  The hypothetical person would also need four unscheduled breaks for ten to fifteen minutes each in an eight-hour day aside from normal breaks.  AR 109-10.  Counsel noted that these limitations were based on the opinion of Dr. Marquis.  AR 110.  Mr. Raschke testified that this hypothetical person would not be able to perform any of Plaintiff's past work because either factor in the hypothetical would eliminate them.  AR 110.  Mr. Raschke confirmed that these limitations would also eliminate all other work.  AR 110.

### D.  ALJ Decision

#### 1.  Step One -- Substantial Gainful Activity

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since September 15, 2012.  AR 14.

#### 2.  Step Two -- Severe Impairment(s)

At step two, the ALJ found that Plaintiff has the following severe impairments: cognitive disorder and mild depressive disorder including features of adjustment disorder.  AR 14-15.

Although Plaintiff contends that he has a neurological disorder, the ALJ found that there is insufficient medical evidence to support a finding that Plaintiff would experience any functional limitations as a result of the claimed neurological impairment.  AR 15.  Therefore, the ALJ concluded that Plaintiff has a non-severe neurological impairment.  AR 15.

#### 3.  Step Three--Listed Impairment(s)

At step three, the ALJ concluded that Plaintiff does not have an impairment or combination

of impairments that meets or medically equals the severity of one of the listed impairments in 20

C.F.R. Part 404, Subpart P, Appendix I. In making this determination, the ALJ considered the

"paragraph B" criteria. He found that Plaintiff has: (1) mild restriction on his activities of daily

living; (2) mild difficulties with social functioning; (3) mild difficulties with concentration,

persistence, or pace; and (4) no episodes of decompensation. AR 15.

He also considered whether Plaintiff's condition met the "paragraph C" criteria. AR 16.

The ALJ found that none of these criteria were satisfied. AR 16.

### 4. Step Four--Past Relevant Work

At step four, the ALJ determined that Plaintiff is capable of performing past relevant work

as an office clerk, receptionist, and in customer relations. AR 21-22. In reaching that conclusion,

the ALJ considered Plaintiff's residual functioning capacity ("RFC"), and found that he has the

capacity to perform medium work as defined in 20 C.F.R. Part 404.1567(c), with some exceptions.

AR 16-21. He concluded that the additional limitations were that Plaintiff can lift and carry 50

pounds occasionally and 25 pounds frequently; sit, stand, and walk six hours of an eight-hour

workday with normal 2 hour breaks; complete complex tasks with frequent interaction with

coworkers, supervisors, and the public; and able to handle normal ordinary workplace stress but

with no fast-paced or production-quota work. AR 16.

In support of the designated RFC, the ALJ noted that he based this designation on the

totality of medical opinions in the record. AR 16. Although he found that Plaintiff's medically

determinable impairments could reasonably be expected to cause the symptoms alleged, he also

found that Plaintiff's statements about the intensity, persistence, and limiting effects of those

symptoms were not entirely credible for the reasons set forth in his decision. AR 17-21. He found

that Plaintiff's broad range of activities of daily living was not consistent with total disability. AR

19. He found that his credibility was further undermined by the record as a whole, which he found

was not consistent with the severity of symptoms and limitations alleged. AR 20. For example,

the ALJ noted that Plaintiff obtained a college degree and has a fairly good work history,

including ten years in his most recent job in customer relations for a wine brokerage. AR 20. He

also explained that Plaintiff's treatment has been conservative, there is no evidence that he takes

medication to treat his alleged symptoms, and mental status examinations have been repeatedly within normal limits. AR 20. Finally, although Plaintiff claims that his condition has significantly deteriorated since September 2012, the medical record does not support a worsening of his symptoms. AR 20.

The ALJ also reviewed the medical evidence. He gave great weight to the medical opinions of Dr. Cohen, Dr. Debolt, and Dr. Davis, all of the medical experts who testified at the two hearings. AR 21. He gave little weight to Dr. Marquis's opinion in the February 13, 2013 neuropsychological report based on Dr. Cohen's testimony that it conflicts with the rest of the medical record. AR 21. Because Dr. Marquis's September 8, 2014 medical source statement incorporated the same findings as her February 13, 2013 neuropsychological report, the ALJ also accorded little weight to the medical source statement. AR 21. As for Dr. Kolin's opinion that Plaintiff has marked impairments, the ALJ gave this opinion little weight because it was not supported by Dr. Kolin's examination or the medical record as a whole. AR 21. Finally, the ALJ gave some weight to the State agency medical consultant's opinions because the limitations noted in those opinions are not completely inconsistent with the record as a whole. AR 21.

Based on the RFC with the specified limitations, the ALJ found that Plaintiff could perform his past relevant work as actually and generally performed. AR 21. He concluded that this finding was supported by the vocational expert's testimony that he could form all three jobs that comprised his past relevant work based on his RFC. AR 21.

### 5. Step Five -- Adjustment to Another Job in the National Economy

In the alternative, the ALJ also found that there are other jobs existing in significant numbers in the national economy that Plaintiff is able to perform. AR 21-22. Specifically, the ALJ found that he would also be able to satisfy the requirements of the jobs for warehouse worker (DOT 922.687-058) and cleaner, janitor (DOT 381.687-018). As a result, the ALJ determined that Plaintiff is not disabled. AR 22.

## II.   LEGAL STANDARD

This Court has the authority to review the Commissioner's decision to deny benefits. 42 U.S.C. § 405(g); see Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998). Substantial evidence is

defined as relevant evidence that a reasonable person might accept as adequate in support of a conclusion; it is "more than a mere scintilla but less than a preponderance." Id.; see also Richardson v. Perales, 402 U.S. 389, 401 (1971); Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir.1997). Reasoning not relied upon by the ALJ cannot be relied upon to affirm the ALJ's decision. See Cequerra v. Sec'y, 933 F.2d 735, 738 (9th Cir. 1991).

To determine whether the ALJ's decision is supported by substantial evidence, courts review the administrative record as a whole, weighing both the evidence that supports and detracts from the ALJ's decision. See Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995.) If the evidence is susceptible to more than one rational interpretation, the Court must uphold the ALJ's conclusion. Id. at 1030-40. The trier of fact, not the reviewing court, must resolve conflicting evidence, and if the evidence can support either outcome, the reviewing court may not substitute its judgment for the judgment of the ALJ. See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005); see also Matney v. Sullivan, 981 F.2d 1016, 1019 (9th Cir.1992). An ALJ's decision will not be reversed for harmless error. Id.; see also Curry v. Sullivan, 925 F.2d 1127, 1131 (9th Cir. 1991).

### A.      Definition of Disability

In order to qualify for disability insurance benefits, a plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Administration ("SSA") utilizes a five-step sequential evaluation process in making a determination of disability. 20 C.F.R. § 404.1520; see Reddick, 157 F.3d 715, 721. If the SSA finds that the claimant is either disabled or not disabled at a step, then the SSA makes the determination and does not go on to the next step; if the determination cannot be made, then the SSA moves on to the next step. 20 C.F.R. § 404.1520.

### B.      Determination of Disability

First, the SSA looks to the claimant's work activity, if any; if the claimant is engaging in substantial gainful activity, she is not disabled. 20 C.F.R. § 404.1520(a)(4)(I). Second, the SSA

considers the severity of impairments; the claimant must show that he has a severe medically determinable physical or mental impairment (or combination of severe impairments) which has lasted or is expected to last twelve months or end in death. 20 C.F.R. § 404.1520(a)(4)(ii). Third, the SSA considers whether a claimant's impairments meet or equal a listing in 20 C.F.R. Part 404 Appendix 1. If so, the claimant is deemed disabled. 20 C.F.R. § 404.1520(a)(4)(iii). Fourth, the SSA considers the claimant's residual functional capacity ("RFC") and past relevant work. If the claimant can still engage in past relevant work, he is not disabled. 20 C.F.R. § 404.1520(a)(4)(iv). Fifth, the SSA considers whether, in light of the claimant's RFC and age, education, and work experience, the claimant is able to make an adjustment to another occupation in the national economy; if so, the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(v); 20 C.F.R. § 404.1560(c).

The claimant bears the burden on steps one through four. Reddick, 157 F.3d at 721. If a claimant establishes an inability to perform her prior work at step four, the burden shifts to the SSA to show that the claimant can perform other substantial work that exists in the national economy at step five. Id.

## III. DISCUSSION

### A. Assigning More Weight to Opinions of Non-Examining Physicians and Consultants than Treating Therapist and Examining Physicians

Plaintiff argues that the ALJ erred by improperly giving more weight to the opinions of non-examining physicians and non-examining state consultants than to the opinions of the treating therapist and examining physicians. The ALJ's balancing of these opinions led him to determine at step four of the sequential evaluation that Plaintiff was not disabled because he was capable of performing his past relevant work. In discounting the weight of the examining physician's Dr. Marquis's opinions, the ALJ relied on non-examining physician Dr. Cohen's testimony that Dr. Marquis's neuropsychological report conflicts with the rest of the medical record, there is no evidence of memory deficits, and a person does not go in and out of cognitive functioning. AR 21. With respect to Dr. Kolin, the ALJ stated that his opinion was given little weight because his finding of marked impairments was not supported by his examination or the medical record as a

whole. AR 21. In giving less weight to these opinions, the ALJ effectively rejected Dr. Marquis and Dr. Kolin's opinions about the severity of the functional restrictions resulting from Plaintiff's impairments.

The Ninth Circuit employs a hierarchy with respect to the weight that the ALJ is to give medical opinions. Specifically, it "distinguishes among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995). "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." Id. "To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." Ryan v. Comm'r of Soc. Sec. Admin, 528 F.3d 1194, 1198 (9th Cir. 2008). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." Id. "The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician *or* a treating physician." Lester, 81 F.3d at 831 (citing Pitzer v. Sullivan, 908 F.3d 502, 506 n.4 (9th Cir. 1990 and Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984)) (emphasis in original). Reliance on the opinion of a nonexamining physician is not error when it is supported by evidence in the record. Id.

In this case, the examining physicians' opinions were contradicted by the opinions of all three medical experts who testified at the hearings. Therefore, the limited weight that the ALJ gave to the opinions of Drs. Marquis and Kolin was not in error if the ALJ provided "specific and legitimate reasons that are supported by substantial evidence." Id.

### 1. Dr. Marquis's Opinions

In his written opinion, the ALJ explained that he gave little weight to Dr. Marquis's opinions because Dr. Cohen testified that her opinions conflict with the rest of the medical record, that a person "does not go in and out of cognitive functioning," and there is no evidence in the

17

medical record that Plaintiff has memory deficits.  AR 21.  Plaintiff contends that the ALJ

impermissibly relied on the opinion of nonexamining Dr. Cohen as the sole reason for rejecting

Dr. Marquis's opinions.

While a nonexamining doctor's opinion alone is not substantial evidence that supports

rejecting the opinion of an examining doctor, see Lester, 81 F.3d at 831, there is substantial

evidence in the record that supports the ALJ's decision to discount Dr. Marquis's controverted

opinions.  As in Andrews v. Shalala, for example, the examining doctors' opinions about Plaintiff

were contradicted by all of the non-examining mental health professionals; were in conflict with

the ALJ's assessment of Plaintiffs' credibility, testimony, and claims symptoms; and were in

conflict with evidence in the medical record.  See 53 F.3d 1035, 1039-43 (9th Cir. 1995).  See also

Thomas v. Barnhart, 278 F.3d 948, 957 (9th Cir. 2002) ("The opinions of non-treating or non-

examining physicians may also serve as substantial evidence when the opinions are consistent

with independent clinical findings or other evidence in the record.").  The ALJ "summarized the

facts and conflicting clinical evidence in detailed and thorough fashion, stating his interpretation

and making findings."  Magallanes v. Bowen, 881 F.2d 747, 755 (9th Cir. 1989).

Dr. Cohen's testimony, which the ALJ specifically relied upon when giving little weight to

Dr. Marquis's opinions, explained the conflicts he found in the medical record.  He noted that

Plaintiff's mini mental status exams were consistently normal, and that one would not expect that

to be the case if Plaintiff had a cognitive disorder.  AR 96.  Dr. Fox, who performed a

neuropsychological examination of Plaintiff, concluded that his remote, recent, and immediate

memory were normal.  AR 436.  Dr. Fox concluded that Plaintiff had "cognitive impairment" that

could worsen with age but his clinical findings indicate that this cognitive impairment at the time

of the examination was mild.  AR 434-39.  On mini mental status examinations given by other

providers, Plaintiff's memory was also found to be intact.  AR 505, 511, 603, 681, 697, 701, 713,

717, 801.  Only Dr. Kolin's testing results indicated significant problems with memory.  AR 489.

Where a cognitive impairment was identified by other providers, it was observed to be mild, as in

Dr. Fox's examination.  AR 441, 443, 456, 472, 478, 482, 497, 499, 506, 512, 620-21, 624, 627-

28, 631, 633, 635, 639, 641, 643, 649, 688-89, 694, 698, 701, 705, 709, 714, 718, 745, 751, 784,

801. Dr. Cohen did not completely dismiss the possibility that Plaintiff has a cognitive disorder, but he concluded that if he did have one the impairment was mild. AR 98. Thus, Dr. Cohen did not necessarily disagree with Dr. Marquis that that Plaintiff has a cognitive impairment, but unequivocally disagreed with her about the severity of this impairment. The other two medical experts who testified at the hearings before the ALJ came to a similar conclusion that the medical record did not support a finding of total disability because of a cognitive impairment. AR 42 (Dr. Davis); AR 89 (Dr. Debolt).

The ALJ's opinion also provided a detailed analysis for concluding that Plaintiff's reported symptoms were not completely credible. In short, the ALJ found that Plaintiff's activities of daily life undermined the severe symptoms he claimed, as well as the fact that he had only received conservative treatment, mostly limited to talk therapy. The ALJ also noted that Plaintiff complained of a severe decline of his mental functioning but that decline was not evidenced in the medical record. This negative credibility finding is relevant to the decision to give less weight to Dr. Marquis's opinions because her conclusions, as were the conclusions of the other providers, were based in large part on Plaintiff's self-reported symptoms.

Furthermore, Dr. Marquis's own clinical observations and conclusions provide additional support for discounting the weight that should be given to her opinion. Although Dr. Marquis concluded that Plaintiff meets the criteria for Cognitive Disorder, NOS, and is disabled, her findings contradict that conclusion to a degree. For example, she found based on her testing that Plaintiff's attention was "mildly impaired to low average," his auditory memory was in the "average to superior range" and his visual memory was in the "average range." AR 665. With respect to executive functioning, Dr. Marquis found that he had a significant decline in executive functioning and yet many measures of his executive functioning were in the average, low average, and high average range and only two measures were impaired. AR 667. Nonetheless, she determined that his "executive functioning and attentional difficulties are significant." AR 668.

This evidence provides "specific and legitimate reasons," which when coupled with Dr. Cohen and the other medical experts' conclusions about Plaintiff's condition, constitute substantial evidence that supports the ALJ's determination that Dr. Marquis's opinions should be

given little weight. A holistic reading of the ALJ's opinion demonstrates that he did not rely solely on Dr. Cohen's opinion in arriving at his conclusion that Dr. Marquis's opinions should be accorded little weight.

Plaintiff also criticizes the ALJ's reliance on Dr. Cohen's opinions because the ALJ allegedly did not incorporate all of the limitations that Dr. Cohen identified in the medical interrogatory that Dr. Cohen completed after the September 2014 hearing. Defendant did not respond to this argument. Plaintiff contends that Dr. Cohen's interrogatory response indicated that Plaintiff would have moderate-to-marked limitations because the moderate boxes were checked but Dr. Cohen drew lines connecting those checked boxes to empty "marked" boxes. Specifically, Dr. Cohen made these marks for the following limitations: understanding and remembering complex instructions, carrying out complex instructions, and the ability to make judgments on complex work-related decisions. AR 740. Dr. Cohen did not explain what these markings meant, but Plaintiff's proffered interpretation is that he meant the markings to indicate that the limitations were moderate-to-marked. In other parts of the interrogatory response, Dr. Cohen stated that Plaintiff does not have any marked functional limitations, which is consistent with the conclusion that these markings were not meant to imply that the limitations were "moderate-to-marked." AR 736, 739. He further stated that Plaintiff "can do simple repetitive tasks at least that involve one to two steps." AR 739. When considering the interrogatories on the whole, it is fair to read Dr. Cohen's responses as indicating moderate limitations only.

The ALJ's opinion did not discuss Dr. Cohen's interrogatory responses that Plaintiff has at least moderate limitations to understand, remember, and carry out instructions and make judgments on complex work-related decisions. Instead, the ALJ concluded that Plaintiff was capable of handling complex tasks. Since the ALJ gave Dr. Cohen's opinions "great weight," it is logical to conclude that he credited Dr. Cohen's findings about Plaintiff's functional limitations. See Norris v. Colvin, 160 F. Supp. 3d 1251, 1265 (E.D. Wash. Feb. 2, 2016) (concluding that the ALJ committed reversible error by omitting any discussion of a medical expert's opinions about the plaintiff's functional limitation when the ALJ had accorded his opinion "significant weight"). However, any error in not specifically discussing Dr. Cohen's opinion that Plaintiff has a

moderate limitation on these activities is harmless. The ALJ did take into account these same moderate limitations in his RFC assessment when he assigned some weight to the opinions of the state medical consultants' opinions, as those consultants applied no more than moderate limitations to Plaintiff's ability to maintain concentration, persistence, or pace. AR 127-41. The ALJ's opinion explained that "[Plaintiff] has significant symptoms from cognitive disorder and mild depression. Consideration is given to these symptoms in the limited medium limitations adopted herein." AR 21.

### 2. Dr. Kolin's Opinions

The ALJ explained that he gave Dr. Kolin's opinion little weight because his finding of marked impairments was not supported by his examination or the medical record as a whole. Dr. Kolin found that Plaintiff was markedly limited in his ability to handle normal work related stress from a competitive work environment and his ability to perform basic work activities and to be safety conscious on a consistent basis without special or additional instructions. AR 490.

The Ninth Circuit has explained that an ALJ does not need to "recite . . . magic words" or make any particular "incantation" when rejecting a medical opinion. Magallanes, 881 F.2d at 755. Instead, the reviewing court may rely on its ability to "draw[ ] specific and legitimate inferences from the ALJ's opinion" to satisfy the standard for crediting a nonexamining medical opinion over an examining or treating medical opinion. Id. Because the ALJ's stated reasons for discounting Dr. Kolin's opinions were summary in nature, the question is whether the ALJ's overall opinion raises "specific and legitimate inferences" that justify doing so.

Plaintiff argues that Dr. Kolin's opinions were supported by his examination, but Plaintiff does not address whether the opinions were contradicted by the medical record. Dr. Kolin based his opinions on various testing results he obtained during his examination of Plaintiff. He noted that Plaintiff "would lose words or train of tougt [sic] during interview/evaluation" and he was considered to be a poor historian. AR 484. Plaintiff was able to recite five digits forward, but only three digits in reverse. AR 486. He could recall zero out of three words after a brief delay. AR 486. Based on these results, Dr. Kolin found that his memory and attention were impaired, but otherwise his mental status exam was normal. AR 486-87. Plaintiff's Full Scale IQ was 84,

which is the "low average" range.  AR 488.  His Processing Speed Index score was 68 which is "extremely low," his Perceptual Reasoning Index was 84, which is "low average," and his Verbal Comprehension Index and Working Memory Index were 100 and 92, respectively, which are both "average."  AR 488.  Dr. Kolin noted that his Immediate Memory falls in the extremely low range, his Delayed Memory falls in the extremely low range, his Auditory Memory falls in the borderline range, and his Visual Memory abilities fall in the extremely low range.  AR 490.  Dr. Kolin diagnosed him with cognitive disorder, NOS, and learning disorder, NOS.  AR 490.

The ALJ's decision to give limited weight to Dr. Kolin's conclusions that Plaintiff had these marked impairments is supported by "specific and legitimate inferences," as discussed above in the section regarding Dr. Marquis.  This contrary medical evidence was discussed thoroughly and in detail in the ALJ's opinion, and the inferences that can be drawn from that discussion are "specific and legitimate" and supported by substantial evidence that Plaintiff did not have marked impairments in these functional areas.  For these reasons, the ALJ did not err in giving limited weight to Dr. Kolin's opinions.

### B. Treating Therapist Yee-Jeong's Mental Disorder Assessments

Plaintiff also contends that it was error for the ALJ to ignore the opinions of Plaintiff's therapist Yee-Jeong.  Yee-Jeong provided two mental disorder assessments, one in November 2013 and another in July 2014.  In the first assessment, Yee-Jeong noted that Plaintiff has reported to her that he has cognitive disorder and that she was seeing Plaintiff to treat his stress.  AR 515.  As to the functional assessment, she noted that she could not complete most of the issues, but opined that Plaintiff was markedly limited as to his ability to get along with co-workers and his ability to tolerate usual stresses encountered in a competitive workplace.  AR 516.  In the second assessment, which was countersigned by Dr. Marquis, Yee-Jeong stated that Plaintiffs' diagnoses were cognitive disorder NOS, depressive disorder NOS, and adjustment reaction to diagnosis, which were substantiated by the psychological testing she was provided by Dr. Marquis.  AR 653.  On his functional assessment, she stated that he was not significantly limited on his ability to perform activities with a schedule, maintain regular attendance, and be punctual within customary tolerances; was moderately limited in his ability to understand and remember very short and

22

simple instructions, the ability to sustain an ordinary routine without special supervision, the ability to make simple work-related decisions, and the ability to get along with co-workers; and he was markedly limited in the ability to carry out very short and simple instructions, ability to perform at a consistent pace without an unreasonable number and length of rest periods, ability to accept instructions and respond appropriately to criticism from supervisors, and the ability to tolerate usual stresses encountered in a competitive workplace. AR 654.

To reject the testimony of a medically acceptable treating source, the ALJ must provide "specific, legitimate reasons based on substantial evidence in the record." Molina v. Astrue, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing Valentine, 574 F.3d at 692). Only licensed physicians and certain other qualified specialists are considered "[a]cceptable medical sources." Id. (citing 20 C.F.R. § 404.1513(a)).[1] Treating sources that are not "acceptable medical sources" are not entitled to the same deference as acceptable medical sources. Id. The ALJ may discount these "other sources" "if the ALJ 'gives reasons germane to each witness for doing so.'" Id. (quoting Turner v. Comm'r of Soc. Sec., 613 F.3d 1217, 1224 (9th Cir. 2010)).

Here, the ALJ did not consider either of these two assessments that were completed by Yee-Jeong or provide reasons that were germane to discounting her opinions. For that reason, the ALJ committed error with respect to Yee-Jeong's assessments.

Defendant seems to concede that the ALJ committed error by not addressing Yee-Jeong's opinions. Instead, Defendant responds that the ALJ was not required to reject or otherwise address Yee-Jeong's opinions because they supported the ALJ's determination. See Ferrel v. Astrue, 2009 WL 3462617, at *7 (E.D. Wash. Oct. 16, 2009) ("Her observations and reports, viewed in their entirety, support the ALJ's determination; therefore the ALJ was not required to reject them."). In support of its argument, Defendant points to several reports created by Yee-Jeong following her visits with Plaintiff that are consistent with the ALJ's finding that Plaintiff was not disabled. Some of this medical evidence was specifically reviewed and discussed in the ALJ's opinion. For example, Yee-Jeong observed that Plaintiff's mental status examination was

[1] The regulation at 20 C.F.R. § 404.1513 was amended as of March 27, 2017. Claims filed before that date are decided under the rules located at 20 C.F.R. § 404.1527.

"within normal limits." AR 18; AR 498. These normal mental status examinations were completed on several occasions. AR 693, 698, 701, 705, 713. During the course of her treatment of Plaintiff she assigned him GAF scores that indicated "mild" or "minimal" symptoms. AR 693, 698, 701-02, 705-06, 709-10.

While Yee-Jeong's treatment records generally align with the ALJ's overall conclusions that Plaintiff had cognitive disorder with mild impairments, the ALJ's opinion does not grapple with Yee-Jeong's mental disorder assessments -- particularly the July 2014 assessment -- which note more serious impairments. Still, any error was harmless because the mental disorder assessments are inconsistent with her prior treatment notes and are based on Dr. Marquis's findings, which the ALJ had already properly rejected.

## IV. CONCLUSION

Based on the preceding discussion, the ALJ did not err in finding that Plaintiff was not disabled and denying benefits. Accordingly, the Court DENIES Plaintiff's motion for summary judgment and GRANTS Defendant's motion for summary judgment.

**IT IS SO ORDERED.**

Dated: March 30, 2018

ELIZABETH D. LAPORTE
United States Magistrate Judge